FILED
U. S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

JAN 2 4 2020

JAMES W. McCORMACK, CLERK
By:_____
                    DEP CLERK

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
DELTA DIVISION

2:20-cv-17-LPR

**Crystal Clear Computer Solutions, LLC**          Plaintiffs
**Trever Simes**

**v.**

**The City of Helena-West Helena**                  Defendants

**Kevin Smith, in his official capacity as Mayor and Chief Executive Officer of
The City of Helena-West Helena and in his individual capacity**

# COMPLAINT

## Parties

1.    The Plaintiff, Crystal Clear Computer Solutions, LLC ("CCCS") is a Limited Liability Company organized on February 1, 2010, under the laws of Mississippi. CCCS provides state-of-the-art IT support, service, and products to small and medium-sized businesses.

2.    Trever Simes is a citizen and resident of the State of Mississippi, and the sole member of CCCS.

3.    Separate Defendant the City of Helena-West Helena ("City") is a body politic and corporate according to Ark. Code Ann. § 14-54-101 (2019), located in Phillips County, Arkansas, a City of the First Class with a population of 12,282. Pursuant to Ark. Code Ann. § 14-54-101 (1) (2) (2019), as a body politic and corporate, the City is capable of being sued, "capable to contract and to be contracted with."

This case assigned to District Judge Rudofsky
and to Magistrate Judge Harris

1

4.  Separate Defendant Kevin Smith ("Mayor Smith") is a natural person who is currently Mayor and Chief Executive Officer of the City. Mayor Smith is sued in his official capacity as Chief Executive Officer of the City and in his individual capacity.

## Subject Matter Jurisdiction

5.  This Court has subject matter jurisdiction over this cause of action under 28 U.S.C. § 1332 (a) because this action is: 1) a civil action, 2) the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and 3) is between a citizen of Mississippi, CCCS, and a citizen of Arkansas, the City. *Moor v. County of Alameda 8212 10*, 411 U.S. 693, *rev'd on other grounds, Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978) (a political subdivision of a State is a citizen of the State for diversity purposes); *Jernigan v. City of Eufaula*, 123 F.Supp.3d 1322 (M.D. Ala. 2015) (a municipality is a citizen of a state for diversity jurisdiction).

6.  This Court has Supplemental jurisdiction over CCCS' state law claim against Mayor Smith in his individual capacity. 28 U.S.C. § 1367(a). CCCS' state law claim arises from the same nucleus of operative facts asserted against both the City and Mayor Smith in his official capacity, such that its state law claim is essentially the same case or controversy under Article III of the United States Constitution. CCCS, as plaintiff, would be expected to try these claims in one judicial proceeding. *Osborn v. The President, Directors, and Company of the Bank of the United States*, 22 U.S. (9 Wheat.) 738, 822–28 (1824); *see also Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375 (1994) (discussing the two purposes of ancillary jurisdiction, the first being applicable here).

## Personal Jurisdiction

7. This Court has personal jurisdiction over Mayor Smith and the City because at all times relevant to this cause of action Mayor Smith had continuous and systematic contacts with the State of Arkansas and the City was a political subdivision, body politic of the State of Arkansas. These contacts are sufficient to justify the State's exercise of judicial power for all claims that CCCS has against the City and Mayor Smith. Int'l Shoe Co. v. Washington, 316 U.S. 310, 317 (1945) (citations omitted).

## Venue

8. Venue is proper in this Court under 28 U.S.C. § 1391(b) (1) & (2) because both Defendants are citizens of Arkansas residing in the district and a substantial part of the events or omissions giving rise CCCS' claims against the City and Mayor Smith occurred in the Eastern District of Arkansas. Furthermore, the City and CCCS agreed that Phillips County was the appropriate venue for any dispute arising under their Management Services Contract ("Agreement"). (See ¶ 9 of the Parties' Agreement attached as Exhibit 1.)

## Factual Basis

9. In the winter of 2017, the City sought proposals or bids for a managed service agreement covering the management of its hardware devices and software programs used by its governmental agencies including the Police Department, Fire Department, City Hall, Streets and Sanitation, and any other city-owned facility or department. CCCS' proposal was the successful bid. On November 8, 2017, CCCS' president, Trever Simes, and, then Mayor, Jay Hollowell executed the five-year Agreement with performance by CCCS commencing on January 1, 2018.

10. CCCS promised to furnish services stated in its Gold Service Plan. The Gold Service Plan required CCCS to provide a Remote Helpdesk, Network Monitoring Services, Hardware and System Support, Online Backup, Network Equipment, Servers, PCs, Antivirus protection, and an onsite service representative. As consideration for CCCS' promise, the City promised to pay a monthly fee of $5975 for a total of 60 months or $358,500. The monthly service fee was due and payable on the first day of each month. CCCS began performing its promise consistent with contract terms on January 1, 2018.

11. In the November 2018 mayoral election, Mayor Jay Hollowell was defeated by two challengers, Kevin Smith and James F. Valley. Later, on December 4, 2018, Kevin Smith narrowly prevailed in the runoff against James F. Valley by 60 votes.

12. On December 31, 2018, CCCS completed its first year of performance of the five-year term. CCCS' performance was impeccable; no complaints were received during the first-year term. CCCS' quality service was ongoing without interruption.

13. Following his January 1, 2019, inauguration, Mayor Smith, as Chief Executive Officer of the City, demanded that CCCS re-bid the Agreement; the Mayor actively solicited bids from at least one other service provider. The Mayor lacked authority to cancel, terminate, or otherwise abrogate CCCS' previously existing contract. Helena-West Helena Code Ordinance (hereinafter "H-WH Code Ordinance") 3.04.04(C)(4), West Helena Ord. No. 03-9 ("All contracts that have been previously approved by the Council shall continue in full force and effect.") (See Exhibit 2, page 27).[1] Had the Mayor been acting within the scope of his authority, the act of demanding a rebidding, soliciting, and receiving of bids of third parties would constitute a repudiation of the binding Agreement between the parties and a breach of contract. *Kellum v. Gray*, 266 Ark. 996,

---

[1] Helena-West Helena-Code of Ordinances, available at https://sites.google.com/site/72342code/code-of-ordinances (last visited on January 23, 2020).

4

590 S.W.2d 33 (Ark. App. 1979) (an anticipatory repudiation of a contract is a present, positive and unequivocal refusal to perform).

14. The Agreement does not authorize or require renegotiation or a price adjustment on demand. Even if authorized to act, the Mayor had no contract right to demand a re-bidding of the valid and enforceable contract. A party to an enforceable contract may make an offer requesting a modification but cannot demand a modification in the absence of contract terms that grant that right. If he had been acting within his scope of authority, Mayor Smith's demand for re-bidding of the Agreement and his solicitation of bids would constitute unequivocal disavowals of the binding contract between the parties and a repudiation of the Agreement. *Kellum v. Gray*, *supra*.

15. Thereafter, the City failed to pay its April invoice due on April 1, 2019, but continued to use the services provided by CCCS.

16. The City failed to pay its May invoice that was due on May 1, 2019.

17. Unbeknownst to CCCS, the City paid Global Technology Service Providers ("Global") $3410 on May 8, 2019, for services substantially similar to those provided by CCCS. (See Exhibit 3.) This act was a ratification of the Mayor's repudiation of the Agreement with CCCS, ratification of the Mayor's hiring of a second contractor, a repudiation by the City of its contract with CCCS, and a breach by the City of its Agreement with CCCS. *Day v. City of Malvern*, 114 S.W.2d 459 (Ark. 1938).

18. On May 14, 2019, the Mayor's Chief of Staff requested CCCS to meet with John P. Dalencourt, the founder of the newly hired management service provider, Global, and demanded that management services transition from CCCS to Global. (See Exhibit 4.) If the Mayor had been acting within the scope of his authority, both the act of hiring a new service provider and

5

requesting a transition to a new service provider would be deemed repudiations and breach of the Agreement. H-WH Code Ordinance 3.04.04(C)(4) (See Exhibit 2). *Kellum v. Gray, supra.*

19. On May 14, 2019, the Mayor demanded the return of all passwords, usernames, security, and access permissions, thereby, preventing further performance of the Agreement by CCCS. (See Exhibit 5.) Had the Mayor been authorized to act, this conduct would constitute prevention of CCCS' performance and a breach of contract. For a discussion of a promisor's duty not to prevent or hinder performance, see generally, *Cantrell-Waind & Associates, Inc., v. Guillaume Motorsports, Inc.*, 968 S.W.2d 72 (Ark. App. 1998).

20. The City Council at its May 21, 2019, meeting informed the Mayor that the City had a contract with CCCS, that the City Council did not authorize the hiring of another computer service company.[2] The City Council informed the Mayor it had not approved another managed services contract. By Ordinance, the City Council's approval was necessary. H-WH Ordinance 10-2009, Sec. 1 (C) (D)(E) (City Council's approval necessary for contracts that exceed $5000 including serial contracts for less than $5000) (attached as Exhibit 6, pages 30-31).[3] See, e.g., *Dotson v. City of Lowell*, 375 Ark. 89, 289 S.W.3d 55 (2008). However, the City Council did not and has not reaffirmed the City's contract with CCCS. Indeed, the City's Treasurer provided CCCS with a copy of Global's May 8, 2019, invoice marked "PAID." (Attached as Exhibit 3.)

21. The City Council accepted and paid for managed services from Global for the month of May, the City Council failed to direct CCCS to ignore the City's Chief Executive's demand for CCCS's access, passwords, and security. In June, the City Council took no further action in

---

[2] A video recording of the May 21, 2019, City Council meeting is available for viewing at: https://www.facebook.com/trever.simes/videos/2434672556564669/ (City Treasurer, Derrick Turner, and City Attorney, James Valley, admonish Mayor Smith).
[3] Revisions to Title 3, Code of Ordinances supplied by City Clerk, Sandi Ramsey, in response to FOIA request. (See Exhibit 7).

performance of its duties under the Agreement resulting in a continuing failure of the condition precedent to CCCS' duty of performance under the Agreement. Restatement (Second) of the Law of Contracts § 243, cmt. a.

22. The City Council's May 21, 2019, admonition of the Mayor was a pageant without substance only creating further confusion. Ten days later, the City failed to pay its June 1 invoice.

23. The City's continued failure to pay was a failure of a condition precedent and a material breach of the contract.

24. On June 3, 2019, 64 days after the City's failure to pay its April invoice, CCCS surrendered, as demanded, all-access, passwords, and security to the Mayor, and CCCS suspended its services as permitted by the Agreement because of the City's nonperformance of its promise to pay its invoices on the first of April, first of May, and the first of June (See Exhibit 1, ¶ 2).

25. On Friday, June 21, 2019, the City's Treasurer, Derrick Turner, offered to cure the City's breach with a promise to pay all past due invoices the following week. (See Exhibit 8.) Seven days later, on June 28th, the Treasurer asked if CCCS wanted its payments mailed or if CCCS would pick up the checks; no checks were tendered on or before June 28, 2019, in performance of the City's offer to cure by paying its overdue invoices before the end of the week. (See Exhibit 8.) On June 28, 2019, the City breached its promise to cure its default by failing to pay the outstanding invoices within seven (7) days.

26. Two days later, on June 30th, the City's Treasurer asked CCCS' president to call him. The City's Treasurer again offered to cure the City's default and agreed to meet CCCS' president in Tunica, Mississippi, on July 1st, with the City's checks in payment of the past due April, May,

and June invoices. On July 1st, CCCS texted to confirm the July 1st meeting. In reply, the City's Treasurer confirmed the dates of the past due invoices and promised that the checks for April, May, and June were in the mail. CCCS accepted the change in the mode of delivery of the City's payment. CCCS sent the Treasurer a link to CCCS' computer.

27. Again, the City breached its promise to cure its default. By July 8th, a reasonable time after the purported mailing, the City's payment had not been received. Moreover, the City's Treasurer informed CCCS on July 11th that a second set of checks were ready and that the Treasurer would meet CCCS' president in Tunica. Later that day, the Treasurer canceled the July 11th meeting, breaching the City's third offer to cure its breach of their Agreement.

28. On July 15, 2019, 106 days after the City failed to pay its April invoice, fifty-five (55) days after the City ratified the Mayor's repudiation of the Agreement, 15 days after the City failed to pay on July 1st, and four days subsequent to the City's third breach of its promise to cure its default, CCCS gave notice of cancellation of the Agreement. The City's nonperformance substantially impaired the value of the Agreement to CCCS and constituted a material and total breach of contract by the City. CCCS concluded that the City was unlikely to cure its defaults, that the City conduct was an evasion of the spirit of their bargain, and was evidence of City's bad faith nonperformance of their Agreement. Restatement § 205, cmt. d. In its notice of cancellation, CCCS demanded the payment of the damages it incurred, including the loss of its bargain, attorneys' fees, and costs, and expressed its intention to sue. (See Exhibit 9.)

**Claim I**

**(Damages for Breach of a Service Contract)**

**Relief Sought**

8

WHEREFORE, Plaintiff prays that the Court set this matter for an early trial and, thereafter, enter judgment on behalf of Plaintiff that includes:

29. Compensatory damages equal to its expectation interest, the benefit of its bargain, under the January 2018 contract.

30. CCCS is entitled to pre-judgment interest on the past due payments from April 2019 to the entry of judgment on its Complaint at the highest rate available.

31. CCCS' compensatory damages are equal to $268,875, the contract price minus payments received plus prejudgment interest. As a lost volume enterprise, the doctrine of mitigation of damages with substitute transactions is inapplicable. See generally, *Gollaher v. Midwood Const. Co.*, 194 Cal.App.2d 640, 651 (Cal. App. 1961) (the duty to mitigate does not apply to contracts . . . which do not preclude plaintiff from undertaking and being engaged in the performance contemporaneously of other contracts); *M & R Contractors & Builders, Inc. v. Michael*, 138 A.2d 350, 355-356 (Md. 1958); Restatement (Second) of the Law of Contracts, §347, cmt. f (1979); E. Allan Farnsworth, Contracts §12.10, p. 800-801 (3rd. ed. 1999); John Edward Murray, Jr., Murray on Contracts §123[E], p.782 (2011).

32. CCCS' suffered other direct loss and expenses associated with the City's breach including penalties and fees imposed by its suppliers for early termination, storage costs for equipment, and the salvage sale of its personal property below its value. Plaintiff CCCS is entitled to recover these incidental losses.

33. An award of pre-judgment interest on all aspects of Plaintiff's recovery at the maximum rate allowed by law;

34. An award of post-judgment interest at the maximum rate allowed by law until paid;

35. An award of the costs incurred in prosecuting this case;

36. An award of CCCS' reasonable attorneys' fees pursuant to Ark. Code Ann. § 16-22-308, *Curry v. Thornsberry*, 128 S.W.3d 438 (2008).

37. A judgment granting CCCS all other legal and equitable relief to which it is entitled.

## Jury Demand

38. CCCS demands a trial by jury.

## Claim II

## Supplemental State Law Claim

## (Tortious Interference with an Existing Contractual Relationship)

39. While working on his graduate degree, Trever Simes ("Trever"), a young entrepreneur, launched an IT service business in January of 2010, and, shortly thereafter, created CCCS, a single member LLC, to provide state-of-the-art IT support, service, and products to small and medium-sized businesses.

40. As a native Arkansan, Trever spent his formative years through high school in West Helena. Trever viewed returning to his former home community in 2010 as a successful service provider an opportunity to return value to the community that instilled in him the precepts of excellence and dependability.

41. On November 8, 2017, CCCS' president, Trever Simes, and Mayor Jay Hollowell, the City's Chief Executive, executed a five-year Agreement with performance by CCCS commencing on January 1, 2018 (Exhibit 1). CCCS' bid was the lowest responsible bid in comparison to others received including one from John P. Dalencourt. CCCS was selected as a result of the City's solicitation and review of bids as required for Cities of the First Class.

Helena-West Helena Title 3, § 3.04.02 (attached as Exhibit 6); Ark. Code. Ann. § 14-58-303(2)(A)(i) (2019); Ark. Code. Ann. § 14-43-601(a)(1)(B) (2019).

42. CCCS promised to furnish services stated in its Gold Service Plan. The Gold Service Plan required CCCS to provide a Remote Helpdesk, Network Monitoring Services, Hardware and System Support, Online Backup, Network Equipment, Servers, PCs, Antivirus protection, and an onsite service representative. As consideration for CCCS' promise, the City promised to pay a monthly fee of $5975 for a total of 60 months or $358,500. The monthly service fee was due and payable on the first day of each month. A contract was formed, and CCCS began performing its promise consistent with contract terms on January 1, 2018.

43. Following his January 1, 2019, inauguration, Mayor Smith, with knowledge of the existing 5-year contract between the City and CCCS, commenced, without justification or privilege, engaging in improper conduct deliberately seeking to prevent and hinder the City's performance of its contract with CCCS.

44. The Agreement between the City and CCCS does not authorize or require renegotiation or a price adjustment on demand. The Mayor had no contract right to demand a re-bidding of the valid and enforceable contract. A party to an enforceable contract may make an offer requesting a modification but cannot demand a modification in the absence of contract terms that grant that right.

45. Without authority and in breach of the City's Agreement with CCCS, and in violation of the City's ordinance, the Mayor demanded that CCCS re-bid the Agreement. H-WH Code Ordinance Tit. 3, § 3.04.04 (C)(4) (Code of Ordinances 2009) (Exhibit 2) ("All contracts that have been previously approved by the Council shall continue in full force and effect.");

Ordinance No. 10-2009, Sec. 3, Repealer (prior Tit. 3, § 3.04.04 (C)(4) not repealed) (See Exhibit 6). The Mayor's conduct was improper.

46. The Mayor actively solicited bids from at least one other service provider, Global, a company formed by John P. Dalencourt on April 4, 2019. (See Exhibit 10.) The Mayor refused to sign the City's checks drawn payable to CCCS, preventing the City's performance of its contractual obligation to pay resulting in a total breach of contract, and culminating in the cancellation of the Agreement. Without authority and in violation of the City Ordinance No. 10-2009, Sec. 1 (C) (D) & (E) (see Exhibit 6, pages 30-31), the Mayor contracted with Global for the identical services provided by CCCS using a monthly purchase order in contemplation of monthly services for an indefinite duration or a serial contract in excess of $5000. The interference with CCCS' contract with the City and the City's nonperformance were direct, immediate, and proximate consequences of the Mayor's conduct. Restatement (Second) of Torts § 766, cmt. k (1979).

47. After the Mayor's interference, the City Council expressed concern at its May 21, 2019, meeting that the Mayor had a business or personal economic interest in Global or its President, John P. Dalencourt, rather than a public interest in interfering with the valid and enforceable contractual relationship between the City and CCCS.[4]

48. Although a mayor is privileged to do business with its city, that privileged is inapplicable here. Ark. Code Ann. § 14-42-107(b)(1). As permitted by statute, the City Council by its ordinances may impose limits on a Helena-West Helen mayor's right to engage in business with the City. If the cost of a service is $2500 or more, advertisement for bids in a local newspaper as

---

[4] The relevant portion of the City Council's May 21, 2019, meeting may be viewed at https://www.facebook.com/trever.simes/videos/2434672556564669/.

imposed by Ark. Code Ann. § 14-58-303 (b)(1)(B) must be undertaken. H-WH Code Ordinance Tit. 3, § 3.16.01(A)(2); Ordinance No. 12-2009, Sec. 1 (2) (c) (See Exhibit 6).

49. Global's first invoice for one month's services to be provided in May of 2019 were invoiced at $3410, in excess of the allowable total of $2500.00. Given the Mayor's personal interest in the substitute contract advertisement for bids was required. Without advertising for bids, any contract between the City and Global is illegal. H-WH Code Ordinance, Title 3, § 3.16.01(C); Ark Code Ann. § 14-58-305 (as referenced in Ordinance No. 10-2009).[5]

50. The Mayor, who is familiar with the computer services industry, knew that substantial economic loss would be suffered by CCCS as a consequence of his preventing and hindering the City's performance of a valid and enforceable contract.[6]

51. Most importantly, the Mayor's improper conduct was *not* privileged on the basis of public interest. The competitive bidding system imposed by the Arkansas Legislature and the City Council is designed to protect the public interest from unreasonable pricing, collusion, nepotism, and political patronage. The City entered its valid and enforceable contract with CCCS; the Mayor was not privileged to interfere directly by preventing and hindering the City's performance in order to advance his personal, business, or economic interest or to advance the personal, business, or economic interest of a political patron. *Mason v. Wal-Mart Stores, Inc.*, 969 S.W.2d 160 (Ark. 1998); *Hayes v. Advanced Towing*, 40 S.W.3d 800 (Ark. App. 2001); Restatement (Second) of Torts § 766 (1979).

---

[5] But see, Ark. Code Ann. § 14-42-107(b)(2) (recognizing an exception to limitations imposed by a governing body for contracts with corporations whose executive or managerial officers are not a council member, municipal official, or municipal employee).

[6] See May 21, 2019, City Council meeting at https://www.facebook.com/trever.simes/videos/2434672556564669/.

52. The contractual relationship between the City and CCCS was a long term, five-year agreement requiring a substantial investment of resources by CCCS and long-term commitments by CCCS to its suppliers so that CCCS could perform its contractual obligations to the City. These long-term commitments included the lease of real estate, long term agreements with service providers by the nonbreaching party. The City's breach not only exposed CCCS to penalties but also a forfeiture, the inability to recapture its investment and the investment of its sole owner and principal, Trever.

53. As the sole member of CCCS, Trever's financial reputation was adversely impacted by the business' failure to pay its obligations as a result of the City's breach.

54. The Mayor's improper interference not only abrogated the statutorily imposed bidding process that resulted in the five-year contract between CCCS and the City, but also facilitated the selection of a replacement service in direct contravention of the required bidding process. This alone supports a conclusion that the Mayor's primary objective was awarding his business partner a long-term contract that his business partner failed to acquire in the previous statutorily sanctioned bidding process that was held in 2017.

55. The Mayor's conduct was not only intentional without justification but also maliciously intended to harm CCCS and its sole owner. See Ark. Code. Ann. § 16-55-206 (1) & (2); *Bayer Cropscience LP v. Schafer*, 385 S.W.3d 822 (Ark. 2011) (in the context of a demand for punitive damages, malice may be inferred; "It is enough if it is shown that, indifferent to consequences, the defendant intentionally acted in such a way that the natural and probable consequence of his act was injury to the plaintiff."), Restatement (Second) of Torts § 766, cmt. s (1979). Moreover, the Mayor continued his conduct designed to harm CCCS and its sole owner after CCCS canceled the Agreement for material and total breach by the City. Trever received calls and

letters authorized by Mayor Smith intended to harass and intimidate him. (See demand letters from SALT Group of Arkansas, engaged by Mayor Smith, demanding a refund of taxes that were *not* paid and even if paid were not refundable by the Arkansas Department of Finance and Administration, attached as Exhibit 11.)

## Claim II

### (Tortious Interference with an Existing Contractual Relationship)

### Relief Sought

WHEREFORE, Plaintiff prays that the Court set this matter for an early trial and, thereafter, enter judgment on behalf of Plaintiff that includes:

56. Compensatory damages equal to the balance due CCCS under the January 2018 contract.

57. Compensatory damages equal to all other losses incurred by CCCS including but not limited to the loss in value of CCCS' business reputation, loss of good will, interest payments and penalties imposed by suppliers, and interest charged by its creditors.

58. Compensatory damages equal to all losses incurred by Trever as a consequence of the Mayor's interference including but not limited to the loss in value of Trever's home that had to be sold to prevent a resort to bankruptcy, inconvenience incurred by Trever and his family, relocation expenses, emotional and mental suffering by Trever, Trever's medical expenses, and the adverse impact on Trever's credit worthiness.

59. Punitive damages not less than $1,500,000 to punish Mayor Smith for his outrageous conduct as an elected public official, acting in violation of the public interest to benefit himself and his political patron.

60. A judgment granting CCCS all other legal and equitable relief to which it is entitled.

## Jury Demand

60. CCCS and Trever demand a trial by jury.

Respectfully submitted,

*Sarah Howard Jenkins*

Sarah Howard Jenkins, Esq.
Ark. Sup. Ct. Reg. No. 97046
Attorney for Plaintiff
Sarah Howard Jenkins, PLLC
P.O. Box 242694
Little Rock, AR 72223
Telephone: (501) 406-0905
Email address: sarah@shjenkinslaw.com
