**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**DELTA DIVISION**

**CRYSTAL CLEAR COMPUTER**                                    **PLAINTIFFS**
**SOLUTIONS, LLC and**
**TREVER SIMES**

**v.**                              **Case No.: 2:20-cv-00017-LPR**

**CITY OF HELENA-WEST HELENA,**                              **DEFENDANTS**
**KEVIN SMITH, in his official capacity as**
**Mayor and Chief Executive of the City of**
**Helena-West Helena, and**
**KEVIN SMITH, in his individual capacity**

## <u>ORDER</u>

Crystal Clear Computer Solutions, LLC ("Crystal Clear") and its President, Trever Simes, brought this lawsuit against the City of Helena-West Helena ("the City") for breach of contract and against Mayor Kevin Smith for tortious interference with an existing contractual relationship.[1] Before the Court today are cross-motions for summary judgment on the breach of contract claim and Mayor Smith's Motion for Summary Judgment on the tortious interference claim.[2]  For the reasons explained in this Order, Crystal Clear's Motion for Summary Judgment on the breach of contract claim is GRANTED in part and DENIED in part.  Crystal Clear is owed payment for the time the contract was still in effect (i.e., up to July 15, 2019).  The City's Motion for Summary Judgement is GRANTED as to the remainder of the breach of contract claim.  Mayor Smith's Motion for Summary Judgment is GRANTED as to the tortious interference claim.

---

[1] Pls.' First Am. Compl. (Doc. 14) at 9, 11.

[2] Defs.' Mot. for Summ. J. (Doc. 45) (moving for summary judgment on all claims); Pls.' Mot. for Partial Summ. J. (Doc. 51) (moving for summary judgment solely on the breach of contract claim).

# I. BACKGROUND

Crystal Clear is a Mississippi LLC that provides information technology ("IT") support and services.[3]  On November 7, 2017, the City Council selected Crystal Clear to provide the City with IT services.[4]  The City Council approved a contract ("the Agreement") with Crystal Clear for "a period of five years at a rate of $5,795.00 per month."[5]  On November 8, 2017, the Agreement was signed by then-Mayor Jay Hollowell (on behalf of the City) and Mr. Simes (on behalf of Crystal Clear).[6]

The Agreement stated that it would become effective on "January 1, 2018, [and] shall remain in force for a period of five years."[7]  Crystal Clear was given the power to terminate the Agreement "upon ninety (90) days written notice."[8]  The City's power to terminate the Agreement, on the other hand, was more limited.  The City also had to provide ninety-days' written notice to terminate, but it could only do so in certain circumstances: (1) if Crystal Clear failed "in any material respect" to satisfy its obligations and did not cure the failure within ninety days of written notice; (2) if Crystal Clear breached "any material term or condition" and did not remedy the breach within ninety days of written notice; or (3) if Crystal Clear terminated or suspended its

---

[3] Defs.' Resp. to Pls.' Statement of Facts (Doc. 71) ¶ 4; Pls.' First Am. Compl. (Doc. 14) at 1; Defs.' Answer to Pls.' First Am. Compl. (Doc. 23) at 1.

[4] Defs.' Resp. to Pls.' Statement of Facts (Doc. 71) ¶ 9; Ex. 33 (Minutes of November 7, 2017 City Council Meeting) to Pls.' Br. in Supp. of Partial Summ. J. (Doc. 53-33) at 1.  This was the second contract between Crystal Clear and the City.  The first was entered into in 2014 and ran for three years.  Ex. 6 (2014 Managed Services Agreement) to Pls.' Add. to Resp. to Defs.' Mot. for Summ. J. (Doc. 68-6).  The City exercised its option to terminate the 2014 contract, heard new proposals in 2017, and again awarded a contract to Crystal Clear.  Ex. 27 (Minutes of July 18, 2017 City Council Meeting) to Pls.' Add. to Resp. to Defs.' Mot. for Summ. J. (Doc. 68-27) at 2.

[5] Ex. 33 (Minutes of November 7, 2017 City Council Meeting) to Pls.' Br. in Supp. of Partial Summ. J. (Doc. 53-33) at 1.

[6] Ex. 7 (Managed Services Agreement) to Pls.' Br. in Supp. of Partial Summ. J. (Doc. 53-7) at 3.

[7] *Id.* at 1.

[8] *Id.*

business operations "unless it is succeeded by a permitted assignee under this Agreement."[9]   The
Agreement further stated:

> Fees will be $5,975.00 per month, invoiced to [the City] on a monthly basis and
> will become due and payable on the first day of each month.  The first month will
> include an additional one-time setup fee of $50.  Services will be suspended if
> payment is not received within 5 days following date due.[10]

The first year of the contract was largely uneventful, and City employees provided Crystal
Clear with positive feedback.[11]   Perhaps the only noteworthy thing about the first year was the
City's relatively routine late payments.   In his deposition testimony, Mr. Simes noted that late
payments from the City were not unusual.[12]   The City's "Vendor Ledger" certainly indicates that
late payments (sometimes days late, sometimes weeks late, and sometimes months late) were the
norm.[13]   Despite the inconsistent frequency of payment, there is no indication that Crystal Clear
suspended services in 2018.

Mayor Hollowell was defeated in the 2018 election, and Mayor Kevin Smith was chosen
as the next Mayor of Helena-West Helena.[14]   It is at this point the relationship between Crystal
Clear and the City began to sour.   Around the start of his term, Mayor Smith began discussing the
legality of the contract with the Arkansas Municipal League.   Mayor Smith also sought an "apples

---

[9] *Id.*

[10] *Id.*

[11] Ex. 36 (Client Feedback Letters) to Pls.' Br. in Supp. of Partial Summ. J. (Doc. 53-36).

[12] Ex. 4 (Simes Dep.) to Pls.' Br. in Supp. of Partial Summ. J. (Doc. 53-4) at 131.

[13] Ex. 31 (City's Vendor Ledger) to Pls.' Add. to Resp. to Defs.' Mot. for Summ. J. (Doc. 68-31) at 61.   For example,
there were no payments in February 2018, a payment on April 18, 2018 (thirteen days after the contract's grace period),
three months' worth of payments on May 2, 2018, no payments in June 2018, two months' worth of payments in July
2018, over $15,000 of payments in August 2018 (eleven and nineteen days after the contract's grace period), one
month's payment on September 21, 2018 (sixteen days after the contract's grace period), a $6,044 payment on October
26, 2018 (twenty-one days after the contract's grace period), one month's payment on November 20, 2018 (fifteen
days after the contract's grace period), and one month's payment on December 14, 2018 (nine days after the contract's
grace period).

[14] Defs.' Answer to Pls.' First Am. Compl. (Doc. 23) at 3-4.

to apples" quote from Sophicity, an IT services provider that works with the Arkansas Municipal League and various municipalities.[15]  These discussions with the Arkansas Municipal League and Sophicity began, at the latest, on December 31, 2018.[16]

In January 2019, Mr. Simes met with Mayor Smith (at Mayor Smith's request) to discuss the Agreement.  Mayor Smith asked Mr. Simes to rebid the contract after learning "there were less costly options available to the City."[17]  Mr. Simes did not agree to rebid.[18]  There is no suggestion that, at this time, the Mayor told Mr. Simes that the City would not honor the Agreement.

The City was late paying its January and February 2019 bills.  These months were not paid until the end of March 2019 at the earliest.[19]  The City did not pay its March 2019 bill on time.  It is unclear whether the City paid its March 2019 bill late or did not pay this bill at all.[20]  The City has not paid its April, May, and June 2019 invoices.[21]

---

[15] Ex. 24 (Sophicity Notes and Mayor Smith's e-mails) to Pls.' Add. to Resp. to Defs.' Mot. for Summ. J. (Doc. 68-24) at 1; Ex. 33 (Dave Mims, Sophicity CEO Dep.) to Pls.' Add. to Resp. to Defs.' Mot. for Summ. J. (Doc. 68-33) at 7:23-8:3, 65:2-21.

[16] *See* Ex. 24 (Sophicity Notes and Mayor Smith's e-mails) to Pls.' Add. to Resp. to Defs.' Mot. for Summ. J. (Doc. 68-24) at 1; CD #1: May 21, 2019 Council Meeting Audio (on file with the Court), at 00:08:00.

[17] Pls.' Resp. to Defs.' Statement of Facts (Doc. 65) ¶ 34.  There is some dispute as to the nature of this meeting.  Mr. Simes claims that Mayor Smith told him the "contract is stupid.  I don't like it.  I don't think it's right for the city.  I don't want to keep your contract.  I need you to rebid your contract."  Defs.' Resp. to Pls.' Statement of Facts (Doc. 71) ¶ 22.  Mayor Smith and the City paint a politer picture.  Defendants claim that Mayor Smith simply asked Mr. Simes to rebid to lower costs due to the City's poor financial situation.  Pls.' Resp. to Defs.' Statement of Facts (Doc. 65) ¶ 35.  The Court will assume the meeting unfolded as described by Mr. Simes.

[18] Pls.' Resp. to Defs.' Statement of Facts (Doc. 65) ¶ 36.

[19] Defs.' Resp. to Pls.' Statement of Facts (Doc. 71) ¶ 26.

[20] In its Statement of Facts, Crystal Clear says the March 2019 bill was paid.  *Id.*  However, the City states that it recently discovered that it may have not paid for the month of March 2019 at all.  The City also claims that it has sent a check to Plaintiffs' counsel for the months that went unpaid up until July 15, 2019, but that Plaintiffs' counsel refused those payments.  The City has told the Court that these funds "are available anytime that Plaintiffs decide they will accept the payment."  *See* Defs.' Br. in Opp'n to Partial Summ. J. (Doc. 70) at 4 n.7.  For the sake of staying consistent to the parties' statements of undisputed facts, the Court will only refer to the months of April, May, and June 2019 as unpaid.

[21] Defs.' Resp. to Pls.' Statement of Facts (Doc. 71) ¶¶ 27, 28, 30.

While Crystal Clear went unpaid, Mayor Smith caused the City to pay $3,410.00 to Global Technology Service Providers ("Global") for IT services on May 8, 2019.[22]  Global is owned by John Dalencourt, a friend and political supporter of Mayor Smith.[23]  While the exact nature of the relationship between Global and the City is disputed, Mayor Smith's Chief of Staff told Sophicity (the other IT service provider that submitted a bid to Mayor Smith) that "[t]he mayor has decided for the time being to go with an IT proposal from a local vendor on a month to month basis."[24]

The IT situation soon came to a head, as evidenced by a series of e-mails exchanged on May 14, 2019.  Mayor Smith's Chief of Staff e-mailed Mr. Simes requesting that he "connect with John Dalencourt about IT transition."[25]  The word "transition" is something of a buzzword in this context, because the Agreement between Crystal Clear and the City says that if the contract is terminated, Crystal Clear would "assist [the City] in the orderly termination of services, including timely transfer of the services to another designated provider."[26]

Mr. Simes protested, noting that he was still under contract for four years, and refused to coordinate with Mr. Dalencourt "until I get an official letter from the City."[27]  Mayor Smith then reached out to Mr. Simes directly, demanding that within twenty-four hours Mr. Simes "turn over all passwords and usernames, any other security and access permissions regarding all work you have done with the City of Helena-West Helena to the Office of Mayor."[28]  At this time, Mr. Simes

---

[22] *Id.* ¶ 29.

[23] Ex. 2 (Mayor Smith Dep.) to Pls.' Add. to Resp. to Defs.' Mot. for Summ. J. (Doc. 68-2) at 14:25-15:3.

[24] Ex. 24 (Sophicity Notes and Mayor Smith's e-mails) to Pls.' Add. to Resp. to Defs.' Mot. for Summ. J. (Doc. 68-24) at 9.

[25] *Id.* at 2-3.

[26] Ex. 7 (Managed Services Agreement) to Pls.' Br. in Supp. of Partial Summ. J. (Doc. 53-7) at 1.

[27] Ex. 24 (Sophicity Notes and Mayor Smith's e-mails) to Pls.' Add. to Resp. to Defs.' Mot. for Summ. J. (Doc. 68-14) at 2-3.

[28] *Id.*

did not turn over the data, Crystal Clear did not suspend services, and Mayor Smith did not take further action on May 14.[29]   It appears instead that Mr. Simes or his allies went to the City Council for assistance.

During a heated City Council meeting on May 21, 2019, members of the City Council and City Attorney Andre Valley confronted Mayor Smith about the payment made to Mr. Dalencourt and the payments due to Crystal Clear.[30]   Mr. Valley advised Mayor Smith that paying Mr. Dalencourt was unauthorized spending and that the City's primary focus should be to "pay the people we owe."[31]   Mr. Valley and members of the City Council forcefully and repeatedly reminded Mayor Smith that the City was under contract with Crystal Clear and cautioned Mayor Smith against attempts to terminate the Agreement due to the potential of litigation against the City.[32]

Mayor Smith justified his solicitation of bids from Mr. Dalencourt and Sophicity by saying he was given legal advice that doing so was necessary to determine if the contract with Crystal Clear violated the Arkansas Constitution.[33]   Mayor Smith maintained that he had a constitutional duty to not make payments to Crystal Clear given the City's financial condition and the cheaper options available.[34]   Mayor Smith also said that the payments to Crystal Clear were being "held up until he turns over this information we requested," not because the City had terminated the contract but because the City owns the information.[35]

---

[29] *Id.* at 4.

[30] CD #1: May 21, 2019 Council Meeting Audio (on file with the Court) at 00:00:00, 00:13:45, 01:15:00.

[31] *Id.* at 00:15:00, 00:24:15, 00:46:45.

[32] *Id.* at 00:01:40, 00:05:00, 00:15:00, 00:26:25, 00:39:00, 00:44:00, 00:53:45, 01:10:00.

[33] *Id.* at 00:00:09, 00:21:00, 00:38:00, 00:49:20, 00:52:00.

[34] *Id.* at 00:35:00, 00:47:50, 01:11:00, 01:13:00; CD #2: May 21, 2019 Council Meeting Audio (on file with the Court) at 00:02:30.

[35] CD #1: May 21, 2019 Council Meeting Audio (on file with the Court) at 00:48:15.

During this meeting, Mr. Dalencourt addressed the City Council to explain that the May 2019 payment to his company was primarily to conduct an audit of the City's IT needs, as well as to address some telephone outages.[36]  Mr. Dalencourt also informed the City Council that neither he nor his company would submit a bid to provide IT services if the City were to terminate the contract with Crystal Clear because he did not want to become involved in a dispute between the City and Crystal Clear.[37]

On May 30, 2019, Mr. Simes sent a letter to City Clerk Sandi Ramsey and members of the City Council notifying them that services would be suspended if the City did not become current on payments.[38]  The letter stated:

> If payments are not received by June 3rd we will have to suspend all services per the agreement.  We truly hope that we can continue our long relationship with the city.
>
> However, if we received [sic] full payments by June 7th we will continue with our support.  If not we will have to take further actions.  We will have to completely delete all of your data backups and will not be able to get them back.  We will remove all of your systems from our tools, and all of our usernames from all of your systems.[39]

Mr. Simes made good on his threat to suspend services on June 3, 2019—Crystal Clear suspended its services to the City after not receiving either a payment for June 2019 or the back payments for the months of April and May 2019.[40]  No payments were made by June 7, the second

---

[36] *Id.* at 00:57:30.

[37] *Id.* at 01:11:30.

[38] Ex. 8 (May 30, 2019 Notice of Non-Payment and Suspension of Services Letter) to Pls.' Br. in Supp. of Partial Summ. J. (Doc. 53-8) at 2.

[39] *Id.*

[40] *Id.* at 1.

deadline Mr. Simes gave the City.[41]  It is not clear whether Mr. Simes took all, part, or none of the "further" actions threatened in his letter.

An eighteen-day long silence between the parties was broken on June 21, 2019, when City Treasurer Derrick Turner contacted Mr. Simes in an attempt to bring the City current with all payments.[42]  Mr. Turner told Mr. Simes "[y]ou're getting your money next week."[43]  Sometime the following week, Mr. Turner told Mr. Simes "[y]ou will get your back payments before the end of the week."[44]  Mr. Turner also told Mr. Simes to "[p]rice some pcs" and that he was "[t]rying to keep [Mr. Simes] busy so [Mr. Simes] can get a July check."[45]  Mr. Turner had the expectation that Crystal Clear would resume services once the City was made current on its payments.[46]

On June 28, 2019, Mr. Turner gave Mr. Simes the option of picking up the checks or having them mailed, and Mr. Simes asked that they be mailed.[47]  On June 30, 2019, Mr. Turner and Mr. Simes spoke over the phone and agreed to meet in Tunica, Mississippi, the following day so that Mr. Turner could deliver the payments.[48]  The next day, Mr. Simes decided to have Mr. Turner mail the checks instead of meeting in person.[49]  Once Mr. Turner confirmed that the checks had been placed in the mail, Mr. Simes told him "I'll send you a link to my software.  If you will load it on your windows pc I will be ab[l]e to log and send it to other computers.  I'll need to send it to

---

[41] Defs.' Resp. to Pls.' Statement of Facts (Doc. 71) ¶ 34.

[42] *Id.* ¶¶ 33-34.

[43] Ex. 9 (Simes Text Messages with Turner) to Pls.' Br. in Supp. of Partial Summ. J. (Doc. 53-9) at 1.

[44] *Id.* at 3.  The text messages provided by the parties don't state an exact date of this exchange, but it did come sometime after June 24, 2019 and before June 28, 2019. *Id.* at 2-3.

[45] *Id.* at 3.

[46] Defs.' Resp. to Pls.' Statement of Facts (Doc. 71) ¶ 34.

[47] Ex. 9 (Simes Text Messages with Turner) to Pls.' Br. in Supp. of Partial Summ. J. (Doc. 53-9) at 4.

[48] Defs.' Resp. to Pls.' Statement of Facts (Doc. 71) ¶ 36.

[49] Ex. 9 (Simes Text Messages with Turner) to Pls.' Br. in Supp. of Partial Summ. J. (Doc. 53-9) at 5.

the other department heads later."[50]  The only way to read this is as Mr. Simes agreeing to resume services in light of the City becoming current on its payments.

By July 8, 2019, the checks had still not arrived.[51]  Mr. Turner confirmed the mailing address with Mr. Simes and told him that he had personally dropped the checks in the mail on July 1, 2019.[52]  Over the next few days Mr. Turner periodically checked in with Mr. Simes to see if the checks ever showed up.[53]  Eventually, these checks were returned to the City as undeliverable.[54]

In any event, on July 10, 2019, Mr. Turner offered to meet Mr. Simes in Tunica to hand-deliver a new batch of checks.[55]  On July 11, 2019, Mr. Turner told Mr. Simes that the new batch of checks was ready.[56]  Later in the day, however, Mr. Simes canceled the meeting with Mr. Turner.[57]  Mr. Turner then asked what Mr. Simes would like to do, but Mr. Simes did not respond.[58]  The following day, Mr. Turner again asked Mr. Simes what he should do with the checks.[59]  On July 16, 2019, Mr. Turner again contacted Mr. Simes to ask whether he should mail the checks or arrange an in-person delivery.[60]

What Mr. Turner did not know when he made this final inquiry is that the previous day, July 15, 2019, Mr. Simes sent an e-mail and letter to Mayor Smith and City Attorney Valley

---

[50] *Id.* at 6.

[51] *Id.* at 7.

[52] *Id.* at 8; *see also* Ex. A (July 1, 2019 envelope, checks, and replacement checks) to Defs.' Answer to Pls.' First Am. Compl. (Doc. 23-1) at 1.

[53] Ex. 9 (Simes Text Messages with Turner) to Pls.' Br. in Supp. of Partial Summ. J. (Doc. 53-9) at 8-10.

[54] *Id.* at 12; *see also* Ex. A (July 1, 2019 envelope and checks) to Defs.' Answer to Pls.' First Am. Compl. (Doc. 23-1) at 1.

[55] Defs.' Resp. to Pls.' Statement of Facts (Doc. 71) ¶ 40.

[56] *Id.* ¶ 41.

[57] *Id.* ¶ 42.

[58] Ex. 9 (Simes Text Messages with Turner) to Pls.' Br. in Supp. of Partial Summ. J. (Doc. 53-9) at 11.

[59] *Id.*

[60] *Id.* at 12; Defs.' Resp. to Pls.' Statement of Facts (Doc. 71) ¶ 45.

notifying them of Crystal Clear's immediate cancellation of the contract.[61]   The Notice of

Cancellation of the Contract stated:

> Dear Mayor Kevin Smith:
>
>    As a result of the City's repudiation and prevention of the January 1, 2018, Managed Services Agreement between Crystal Clear Computer Solutions, LLC ("Crystal Clear Computer") and the City of Helena-West Helena, Arkansas ("City"), Crystal Clear Computer hereby cancels the Managed Services Agreement and gives notice that it will seek recovery of the damages incurred, including attorneys' fees, as a result of the material and total breach of contract by the City.
>
>    Acts constituting the repudiation of the Managed Services Agreement:
>    1)   The City demanded in January 2019 that Crystal Clear Computer rebid the Managed Services Agreement;
>    2)   The City solicited bids from other service providers in January 2019;
>    3)   The City failed to pay invoices for services provided April through May of 2019;
>    4)   On May 14, 2019, the City requested that Crystal Clear Computer meet with John Dalencourt so that IT transition to Dalencourt could be executed; and
>    5)   The City failed to pay the June invoice for services provided in June of 2019.
>
>    Acts by the City constituting prevention of contract performance by Crystal Clear Computer:
>    1)   On May 14, 2019, the City demanded the return of all passwords, usernames, and security and access permissions.[62]

Plaintiffs then filed suit in this Court against the City for breach of contract and against

Mayor Kevin Smith for tortious interference with an existing contractual relationship.  Both sides

have moved for summary judgment on the breach of contract claim against the City, and Mayor

Smith has moved for summary judgment on the tortious interference claim against him.

---

[61] Pls.' Resp. to Defs.' Statement of Facts (Doc. 65) ¶ 48.

[62] Ex. 11 (Notice of Cancellation) to Pls.' Br. in Supp. of Partial Summ. J. (Doc. 53-11).

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[63]  Conversely, if the nonmoving party can present specific facts "showing the existence of a genuine issue for trial," then summary judgment is not appropriate.[64]  The moving party has the burden of showing that (1) there is an absence of a genuine dispute of material fact on at least one essential element of the nonmoving party's case and (2) the absence means that a rational juror could not possibly find for the nonmoving party on that essential element of the nonmoving party's case.[65]  If the moving party meets that burden, the burden then shifts to the nonmoving party to show that there is a genuine dispute of material fact.[66]  The nonmoving party meets this burden by designating specific facts in affidavits, depositions, answers to interrogatories, admissions, or other record evidence that shows "there is a genuine issue for trial."[67]  The Court must view the evidence in the light most favorable to the nonmoving party and give the nonmoving party the benefit of all reasonable inferences.[68]

---

[63] Fed. R. Civ. P. 56(a).

[64] *Grey v. City of Oak Grove*, 396 F.3d 1031, 1034 (8th Cir. 2005).

[65] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

[66] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986); *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011).

[67] *Celotex Corp.*, 477 U.S. at 322-24.

[68] *Pedersen v. Bio-Med. Applications of Minn.*, 775 F.3d 1049, 1053 (8th Cir. 2015).  The Court is faced with cross-motions for summary judgment on the breach of contract claim.  But just because both sides filed motions for summary judgment does not mean either side is entitled to it.  The Court must evaluate each summary judgment motion using the foregoing standard.

### III.  BREACH OF CONTRACT[69]

Crystal Clear primarily argues that the months of unpaid invoices constituted a material breach such that it could immediately end the Agreement and bring suit.[70]  Crystal Clear also contends that Mayor Smith's actions, coupled with "the City Council's failure to enjoin or remove Kevin Smith," amounted to a repudiation of the Agreement by the City.[71]  The City maintains that it was making efforts to "become current on payments due,"[72] and thus the Agreement "ended at the behest of Mr. Simes."[73]

#### A.  The City's Late Payments Did Not Entitle Crystal Clear to End the Agreement

Any nonperformance of a duty contemplated under a contract is a breach.[74]  Thus, the City did breach the Agreement when it failed to pay its April, May, and June 2019 invoices.  But was the breach material?  Only a material breach relieves the other party's full contractual obligations.[75]

---

[69] A critical element to any breach of contract claim is a valid and enforceable contract.  In this case, there is a dispute between the City and Crystal Clear over whether the Agreement was legally valid and enforceable.  The City claims that the Agreement is void *ab initio* because of Ark. Const. art. 12 § 4, which prohibits municipal contracts in excess of that municipality's revenue for the fiscal year.  This state constitutional provision has not been consistently interpreted and so its application to the case at bar is unclear.  The Court does not need to reach this question.  The City has conceded that it owes payment for the months while the Agreement was still in effect.  For the rest of Crystal Clear's breach of contract claim, and for the tortious interference claim, summary judgment is appropriate on other grounds.

[70] Pls.' Br. in Supp. of Partial Summ. J. (Doc. 53) at 12-14.

[71] *Id.* at 12.  *See also* Ex. 11 (Notice of Cancellation) to Pls.' Br. in Supp. of Partial Summ. J. (Doc. 53-11).

[72] Defs.' Br. in Supp. of Summ. J. (Doc. 46) at 3.

[73] *Id.* at 17.

[74] *Boellner v. Clinical Study Centers, LLC*, 2011 Ark. 83, at 11, 378 S.W.3d 745, 753.

[75] *Id.* at 11, 378 S.W.3d at 753 (citing *Stocker v. Hall*, 269 Ark. 468, 602 S.W.2d 662 (1980)).  It is sometimes said that the materiality of a breach is a question of fact.  *See Chambers v. McDougald*, 2017 Ark. App. 357, at 7, 520 S.W.3d 740, 744 ("Whether a breach is material is a question for the fact-finder."); *Spann v. Lovett & Co.*, 2012 Ark. App. 107 at 20-21, 389 S.W.3d 77, 93 (ruling that the trial court correctly "sent the issue of whether that breach was a first material breach to the jury"); *Firemen's Ins. Co. of Newark, N.J. v. Cadillac Ins. Co.*, 13 Ark. App. 89, 90-91, 679 S.W.2d 821, 822 (Ark. Ct. App. 1984) (reviewing trial court's finding of material breach for clear error).  However, the Arkansas Supreme Court has ruled on the substantiality of a breach as a matter of law.  *TXO Prod. Corp. v. Page Farms, Inc.*, 287 Ark. 304, 307-08, 698 S.W.2d 791, 793 (1985) (treating the materiality of a breach as a legal conclusion); *National Sur. Co. v. Long*, 79 Ark. 523, 96 S.W. 745, 746, 748 (1906) (denying a motion for rehearing because "as a matter of law . . . the default . . . was a substantial breach of the contract").

A "material breach is a failure to perform an essential term or condition that substantially defeats the purpose of the contract for the other party."[76]  "An influential circumstance in the determination of the materiality of a failure to fully perform a contract is the extent to which the injured party will obtain the substantial benefit that she reasonably anticipated."[77]  This wording is nearly identical to the first of five "circumstances significant in determining whether a failure is material" from the Restatement (Second) of Contracts section 241.  Crystal Clear argues that the late payments were a material breach by weighing this and the remaining factors listed in section 241.  While the Arkansas Court of Appeals often cites section 241 for this purpose[78]—and it can be said that the Arkansas Supreme Court gave an approving nod in *TXO Production Corp. v. Page Farms, Inc.*[79]—Crystal Clear cites no case, and this Court has found none, where the Arkansas Supreme Court affirmatively adopted this section of the Restatement and the factors listed there.  However, the Arkansas Supreme Court's Committee on Jury Instructions lifts its instruction for "substantial performance" directly from section 241.[80]  Because "[s]ubstantial performance is the antithesis of material breach,"[81] it is this Court's prediction that the Arkansas Supreme Court would apply the factors in section 241 to the undisputed facts of this case to determine whether the City's failure to make its April, May, and June 2019 payments was a material breach.[82]

---

[76] *Dye v. Diamante*, 2017 Ark. 42, at 11-12, 510 S.W.3d 759, 767.

[77] *Boellner*, 2011 Ark. 83, at 10, 37 S.W.3d at 753.

[78] *See, e.g.*, *Roberts Contracting Co. v. Valentine-Wooten Road Pub. Facility Bd.*, 2009 Ark. App. 437, at 7-8, 320 S.W.3d 1, 7.  *See also* Comment to Ark. Model Jury Instruction Civ. 2428 (2020).

[79] 287 Ark. at 308, 698 S.W.2d at 793.

[80] Ark. Model Jury Instruction Civ. 2428 (2020).

[81] 15 Samuel Williston & Richard A. Lord, *Williston on Contracts* § 44:55 (4th ed.).

[82] *Leonard v. Dorsey & Whitney LLP*, 553 F.3d 609, 612 (8th Cir. 2009) ("In attempting to predict state law, a federal court may 'consider relevant state precedents, analogous decisions, considered dicta, scholarly works, and any other reliable data.'") (quoting *McKenna v. Ortho Pharm. Corp.*, 622 F.2d 657, 663 (3d Cir. 1980)).

The first factor for this court to consider is the extent to which Crystal Clear will be deprived of the benefit which it reasonably expected.[83]   The sole benefit expected under the Agreement was money in exchange for services each month.   Thus, when the City breached by failing to pay, Crystal Clear was deprived entirely of the benefit it reasonably expected.  This factor weighs in favor of a material breach.

The second factor is the extent to which Crystal Clear could be adequately compensated for the part of the benefit of which it will be deprived.[84]   Because the benefit of which it will be deprived is money, and because it is an easily measured amount of money, Crystal Clear could be adequately compensated.  This factor weighs against a material breach.

The third factor is the extent to which the City would suffer forfeiture if the breach were deemed material.[85]   The City would not suffer any forfeiture here.  There were no investments or preparations made with the expectation of the Agreement continuing, nor did the City pay in advance for any services that Crystal Clear ultimately did not perform.  This factor weighs in favor of a material breach.

The fourth and, in this case, critical factor is the likelihood that the City would have cured the breach, considering "all circumstances, including any reasonable assurance that the failure will be cured."[86]   The facts of this case establish that the City intended to become current on its

---

[83] *Boellner*, 2011 Ark. 83, at 10, 37 S.W.3d at 753; Ark. Model Jury Instruction Civ. 2428 (2020).  *See also* Restatement (Second) of Contracts § 241(a) (Am. Law Inst. 1981).

[84] Ark. Model Jury Instruction Civ. 2428 (2020).  *See also* Restatement (Second) of Contracts § 241(b) (Am. Law Inst. 1981).

[85] Ark. Model Jury Instruction Civ. 2428 (2020).  *See also* Restatement (Second) of Contracts § 241(c) (Am. Law Inst. 1981).

[86] Ark. Model Jury Instruction Civ. 2428 (2020).  *See also* Restatement (Second) of Contracts § 241(d) (Am. Law Inst. 1981).

payments with the expectation that the Agreement would continue.  Mr. Simes knew this.  No rational juror could conclude otherwise on this record.

From the beginning, it was not unusual for the City to fall behind on payments.  This was the case even before Mayor Smith took office and expressed his displeasure with the Agreement. After Mayor Smith took office, the City fell behind for the months of January, February, and March but Crystal Clear continued under the Agreement and eventually received payment (certainly for January and February, and Crystal Clear maintains it was paid for March).  Moreover, before Mr. Simes sent the Notice of Cancellation on July 15, 2019, the City Treasurer had already printed and mailed one batch of checks and was making efforts to hand-deliver the replacement batch.  Mr. Simes knew this.  In fact, the day *after* Mr. Simes sent the cancellation notice, Mr. Turner (who did not know of the cancellation at the time) made another attempt to bring the City current on payments.  It is clear, then, that the City had every intention and ability to make the back payments and continue with the Agreement.  Recall also that, just weeks before, the City Council made clear to the Mayor that the Agreement was still in effect and had to be honored.  This factor weighs heavily against a material breach.

Crystal Clear cites *Telcoe Credit Union v. Eackles*[87] to contend that the City's attempts to cure the breach were insufficient.[88]   There, the Arkansas Supreme Court defined tender of performance as "an offer to perform a condition or obligation coupled with the present ability of immediate performance, so that were it not for the refusal of cooperation by the party to whom tender is made the condition or obligation would be immediately satisfied."[89]  Reliance on *Telcoe*

---

[87] 293 Ark. 149, 732 S.W.2d 477 (1987).

[88] Pls.' Br. in Reply to Defs.' Response in Opp'n to Partial Summ. J. (Doc. 78) at 16.

[89] *Telcoe Credit Union*, 293 Ark. at 151, 732 S.W.2d at 478 (quoting *Cook v. Talbert*, 216 Ark. 370, 373, 225 S.W.2d 682, 684 (1950)).  In *Telcoe*, the Arkansas Supreme Court held that a woman's "verbal and her attorney's written

is misplaced for two reasons.  First, legal tender of performance was a requirement of the underlying claim in *Telcoe*.[90]  Here, the Court is only concerned with the *likelihood* of cure. Second, the undisputed facts show that the City satisfied the *Telcoe* standard.  Mr. Turner offered multiple times to mail or hand-deliver checks to Mr. Simes.  These checks were "an actual production of the subject matter of the tender—in this case, money or its equivalent."[91]  If it were not for Mr. Simes's refusal to cooperate by canceling the July 11, 2019 meeting and ignoring Mr. Turner's attempts to set up a new meeting, Crystal Clear would have received payment.

The final factor to consider is the extent to which the City's behavior was "consistent with standards of good faith and fair dealing."[92]  Crystal Clear argues that bad faith has been established because the City engaged in "subterfuges and evasion," the Mayor was determined to terminate the contract "by any means," and Mr. Turner's "equivocation frustrated what might otherwise have been an effort to keep the agreement intact and suggests that his actions were unauthorized."[93]

Crystal Clear does not specify exactly what acts by the City amount to subterfuges and evasions.  The record before the Court shows that late payments were the normal course of dealing between the parties.  As far as Mayor Smith is concerned, it is clear he was not a fan of the 2017 contract.  Nevertheless, Mayor Smith's actions do not establish bad faith *by the City* when considering all the facts.  When the City Council members and City Attorney Valley learned about Mayor Smith's actions they forcefully and repeatedly told him those actions were unauthorized and that the City was under contract with Crystal Clear.  Mr. Simes claims that, after this City

---

offers" were not a legal tender because she was unemployed and therefore, she did not have "the present ability of immediate performance."  *Id.* at 151-52, 732 S.W.2d 478-79

[90] *Id.* at 151, 732 S.W.2d at 478.

[91] *Id.* at 152, 732 S.W.2d at 479.

[92] Ark. Model Jury Instruction Civ. 2428 (2020).  *See also* Restatement (Second) of Contracts § 241(e) (Am. Law Inst. 1981).

[93] Pls.' Br. in Opp'n to Defs.' Mot. for Summ. J. (Doc. 67) at 27.

Council meeting, a city employee told him that Mayor Smith had instructed them not to make payments to Crystal Clear. [94]  Even if this were an undisputed fact, the City Treasurer had checks printed and had made multiple efforts to deliver them to Mr. Simes so that Crystal Clear's services would continue when Mr. Simes sent the notice of cancellation.  Thus, even if Mayor Smith had instructed city employees not to pay Crystal Clear, the City still made efforts to become current on payments and continue with the Agreement.

Finally, any "equivocation" by Mr. Turner certainly does not indicate that "his actions were unauthorized," and Mr. Simes is *at least* equally responsible. [95]  It was Mr. Simes who decided to have the first round of checks mailed instead of meeting Mr. Turner in person, as had originally been planned in their June 30, 2019 phone call.  Likewise, it was Mr. Simes who canceled the July 11, 2019 meeting with Mr. Turner.  Afterwards, it was Mr. Simes who did not respond to multiple attempts by Mr. Turner to deliver the checks.

The Court concludes that the City's failure to pay the April, May, and June 2019 invoices was not a material breach.  Thus, Crystal Clear and Mr. Simes were still obligated to abide by the contract's terms.[96]  The Agreement contemplated the possibility of late payments and gave Crystal Clear the ability to suspend services until payments were made current.  This power was rightfully exercised on June 3, 2019.  Crystal Clear always had the option to terminate the Agreement—but only with ninety-days' written notice.  However, Crystal Clear was not entitled, either under the contract or Arkansas law, to immediately declare the Agreement over because of the City's late payments.

---

[94] *See* Ex. 28 (Simes Affidavit) to Pls.' Add. to Resp. to Defs.' Mot. for Summ. J. (Doc. 68-28); Ex. 24 (Sophicity Notes and Mayor Smith's e-mails) to Pls.' Add. to Resp. to Defs.' Mot. for Summ. J. (Doc. 68-24) at 10.

[95] Pls.' Br. in Opp'n to Defs.' Mot. for Summ. J. (Doc. 67) at 27.

[96] *Boellner*, 2011 Ark. 83, at 11, 378 S.W.3d at 753 (citing *Stocker v. Hall*, 269 Ark. 468, 602 S.W.2d 662 (1980)).

Even if the City's failure to pay its April, May, and June 2019 invoices was a material breach, Crystal Clear still could not immediately end the Agreement because it waived the breach.[97]   No rational juror could conclude otherwise.   The Arkansas Supreme Court has long recognized the "elemental" principle that when one party to a contract knows of another party's breach, yet continues to perform and expects the other party to continue performing, the non-breaching party has waived its right to "insist on the breach."[98]   Crystal Clear knew the City was consistently late in making its monthly payments.   Mr. Simes stated as much in his deposition, and the City's vendor ledger shows that late payments were the norm.   Canceling the Agreement for failure to pay on time after over a year of lax enforcement of the payment deadlines requires giving "reasonable notice of intent to cancel" so that the City would have "the opportunity to bring [its] payments up to date and to be aware that in the future, no delinquent payments would be accepted."[99]

The closest thing to such notice came in the form of the letter that Mr. Simes sent to City Clerk Sandi Ramsey on May 30, 2019.   That letter, however, does not notify the City that Crystal

---

[97] There are cases where the issue of waiver should be left to a jury.  *See Southern Pipe Coating, Inc., v. Spear & Wood Mfg. Co.*, 235 Ark. 1021, 1023-24, 363 S.W.2d 912, 913-14 (1963) ("Under the evidence, waiver was a question of fact for the jury.").  There are also cases where waiver is resolved as a matter of law.  *Little Rock Cooperage Co. v. L.N. Lanier & Co.*, 83 Ark. 548, 104 S.W. 221 (1907) ("[I]f there was a breach of contract by appellant . . . appellee had waived such breach, for such was the *legal effect* of the uncontroverted evidence.") (emphasis added).  This case falls into the second category.  In *McMurray v. Boyd*, the Arkansas Supreme Court stated that "the main fact to be found by the jury was whether plaintiff's alleged breach of the contract had been condoned.  If that fact was shown, its *legal effect* was a waiver of the right to" end the contract.  58 Ark. 504, 25 S.W. 505, 506 (1894) (emphasis added).  The *McMurray* court remanded the case for a jury finding because the evidence tended to show "a reasonable excuse" for delay in deciding to terminate the contract, so the issue of whether the breach was condoned was disputed.  *Id.*  Here, the undisputed facts establish that Crystal Clear condoned, and was willing to continue accepting, the City's routinely late payments.

[98] *Wolff v. Alexander Film Co.*, 186 Ark. 848, 56 S.W.2d 424, 424 (1933) (quoting *Clear Creek Oil & Gas Co. v. Brunk*, 160 Ark. 574, 255 S.W. 7 (1923)).

[99] *Robinson v. Cline*, 255 Ark. 571, 575, 501 S.W.2d 244, 246 (1973); *Ford Motor Credit Co. v. Ellison*, 334 Ark. 357, 367, 974 S.W.2d 464, 470 (1998) ("A seller may waive its rights to strict compliance with the terms of the finance contract where it has established a course of dealing of accepting late payments from the buyer.  The waiver remains in effect until such time that the seller notifies the buyer that the seller will no longer accept late payments and will henceforth require strict compliance with the contract.").

Clear intends on canceling the Agreement as a result of late payments.  Instead, it notifies the City that Crystal Clear will exercise its contractual right to suspend services—a right already available under the Agreement due to the City's non-payment for the months of April and May 2019. Moreover, the letter shows that Crystal Clear was willing to *continue* accepting late payments by stating that services would continue if payment was received by June 7.  True, the letter does go on to state that if payment is not received by June 7, the Agreement would effectively be canceled because Crystal Clear would permanently "delete all of [the City's] data backups."[100]  While this could be seen as notice of intent to cancel under *Robinson v. Cline*, demanding three months' worth of payment within 7 days is not "*reasonable* notice of intent to cancel."[101]  In any event, Crystal Clear effectively reaffirmed the waiver when Mr. Simes did not delete the data after June 7, agreed to accept the back payments in late June and early July, and sent the City a link to resume services.

When Mr. Simes made the decision to cancel the Agreement, the City Council had very recently taken Mayor Smith to task about interfering the Agreement.  The City Treasurer had made several attempts to pay Crystal Clear and Mr. Simes resumed services once the back payments were in the mail.  This clearly shows both parties' intention to continue with the Agreement.  It was Mr. Simes who abruptly refused to accept the back payments at the last minute.  Thus, it was Mr. Simes who wrongfully brought the Agreement to an early end.

## B. The City Did Not Otherwise Repudiate the Agreement

Stitching together some underdeveloped assertions scattered across the papers, one can just about deduce that Crystal Clear has an alternative argument—that other various acts or omissions by Mayor Smith and the City amounted to a repudiation of the contract.  Specifically, these are:

---

[100] Ex. 8 (May 30, 2019 Notice of Non-Payment and Suspension of Services Letter) to Pls.' Br. in Supp. of Partial Summ. J. (Doc. 53-8) at 2.

[101] *Robinson*, 255 Ark. at 575, 501 S.W.2d at 246 (emphasis added).

Mayor Smith soliciting bids from third parties; Mayor Smith's "unauthorized withholding of [Crystal Clear's] payments from January 2019 through March of 2019;"  Mayor Smith asking Crystal Clear to rebid the contract; Mayor Smith hiring Global Technology Service Providers in May 2019; Mayor Smith's office requesting that Crystal Clear give information to Global in order to transition services; Mayor Smith demanding return of all passwords, usernames and other access; and the "City Council's failure to enjoin or remove Kevin Smith."[102]

Considered in the light of the facts of this case, none of these acts—alone or in combination—establish that the City "definitely manifested an intention not to perform" such that Crystal Clear and Mr. Simes could "treat the contract as ended."[103]  No rational juror could conclude otherwise.  Of all the acts that Plaintiffs list, the only one that could be said to definitely manifest an intent not to perform would be the May 14, 2019 e-mail from Mayor Smith's Chief of Staff requesting that Mr. Simes work with Mr. Dalencourt on a "transition."[104]  Still, even Mr. Simes did not attribute this act to the City at the time.  He states in his reply e-mail that he would not comply unless he were to receive "an official letter from the City."[105]  The City Council members and City Attorney Valley, for their part, made it clear at the May 2019 City Council meeting that they did not authorize of or approve Mayor Smith's actions and instead emphasized their desire to avoid litigation and continue with the Agreement they had awarded to Crystal Clear in 2017.

Moreover, every act listed by Crystal Clear took place before it first exercised the contractual right to suspend services for nonpayment on June 3, 2019.  Despite all of Mayor

---

[102] Pls.' Br. in Supp. of Partial Summ. J. (Doc. 53) at 12.

[103] *Cox v. McLaughlin*, 315 Ark. 338, 345, 867 S.W.2d 460, 463 (1993).

[104] Ex. 24 (Sophicity Notes and Mayor Smith's e-mails) to Pls.' Add. to Resp. to Defs.' Mot. for Summ. J. (Doc. 68-24) at 2-3.

[105] *Id.*

Smith's actions, Crystal Clear did not treat the Agreement as ended and instead availed itself of the rights provided by the Agreement.  Accordingly, even if a repudiation occurred, Crystal Clear waived it when it, "with full knowledge of [the City's] repudiation, elected to stand on the contract."[106]  Crystal Clear cannot choose "to continue with the contract" then later "make a second and inconsistent election to treat it as abrogated."[107]  Moreover, the City was attempting to make back payments, and Crystal Clear was willing to accept those back payments and keep going with the Agreement until Mr. Simes sent the cancellation letter on July 15, 2019.  Mr. Simes either did not consider Mayor Smith's May 2019 conduct to be a repudiation of the Agreement or Mr. Simes waived the alleged repudiation.  Thus, the first party to the Agreement to "definitely manifest an intention not to perform" was Crystal Clear, not the City.[108]

*C. Crystal Clear Can Only Recover for the Unpaid Months While the Agreement was Still in Effect*

Even if the City did materially breach and/or repudiate the Agreement, Crystal Clear would not be entitled to the primary relief sought in the Complaint—the remaining payments if the five-year contract had been fully performed.[109]  This is a claim based on the doctrine of anticipatory repudiation and the Arkansas Supreme Court has made clear that "[w]here the contract, or the unperformed portion of it, is merely to pay money at specified times, the refusal to pay does not accelerate the maturity of installments which are not due under the contract."[110]

In *Tech-Neeks, Inc. v. Francis*, the Arkansas Supreme Court reaffirmed a longstanding rule that when a contract for services is to be paid in installments, the service provider "is entirely

---

[106] *Mass. Protective Ass'n v. Jurney*, 188 Ark. 821, 68 Ark. S.W.2d 455, 456 (1934).

[107] *Id.*

[108] *Cox*, 315 Ark. at 345, 867 S.W.2d at 463

[109] Pls.' First Am. Compl. (Doc. 14) at 10.

[110] *Mfrs.' Furniture Co. v. Cantrell*, 172 Ark. 642, 290 S.W. 353, 354 (1927).

within his rights, after making partial performance, to abandon further execution of the contract where the other party has failed to pay the installments due, and one may also *collect for the work already done* at the contract price."[111]   Thus, even if Crystal Clear's total cancellation of the contract was proper, it is not entitled to recover anything beyond July 15, 2019.

The Arkansas Supreme Court likewise addressed damages in suits for breach of employment contracts in *Van Winkle v. Satterfield*:

> A servant who has been wrongfully discharged by his employer before the time which he was hired has expired has three remedies:  First, he may consider the contract as rescinded, and recover on a quantum meruit what his services were worth, deducting what he had received for the time during which he had worked; second, he may wait until the end of the term, and then sue for the whole amount, less any sum which the defendant may have a right to recoup; third, he may sue at once for breach of the contract of employment.  He, however, can adopt only one.[112]

While the agreement between Crystal Clear and the City is not an employment contract, it shares the defining features of the contract at issue in *Van Winkle* in that both involved an agreement to exchange services for monthly payment over a defined period.[113]   Here, Crystal Clear did not choose door number two.  It was Crystal Clear who "consider[ed] the contract as rescinded,"[114] so it would seem Crystal Clear chose door number one.  Yet, Crystal Clear is not seeking to recover only for services rendered but for full breach of contract damages.  So, maybe it would say it chose door number three.  Either way, the result is the same.  *Van Winkle* makes clear that the only damages recoverable are those flowing *from the breach*.[115]   Here, the City's breach was the failure

---

[111] 241 Ark. 390, 393-94, 407 S.W.2d 938, 941 (1966) (emphasis added).

[112] 58 Ark. 617, 25 S.W. 1113, 1114 (1894) (internal quotations omitted); *see also Jim Orr & Assocs., Inc. v. Waters*, 299 Ark. 526, 530, 773 S.W.2d 99, 101-02 (1989) (reaffirming *Van Winkle*).

[113] *Van Winkle*, 58 Ark. 617, 25 S.W. at 1113 (employment contract for one year with payment of $60 made each month).

[114] *Id.* at 1114.

[115] *Id.* (stating that the law "simply intends to save [the injured party] from actual loss by the employer's breach of contract").

to pay the invoices for April, May, and June 2019 (and maybe March 2019, too).  That breach did not end the Agreement—Mr. Simes did.  Thus, any future payments that Crystal Clear will no longer receive are not a result of the City's breach and are not recoverable.

For these reasons, Crystal Clear's Motion for Summary Judgment for breach of contract is GRANTED in part.  The City failed to pay for services rendered in the months of April, May, June, and half of July 2019.[116]  It owes Crystal Clear for the unpaid months.  The City's Motion for Summary Judgment is GRANTED as to the remainder of Crystal Clear's breach of contract claim.

### IV.  TORTIOUS INTERFERENCE CLAIM AGAINST MAYOR SMITH

Crystal Clear has also sued Mayor Smith in his individual capacity for the tort of interference with an existing contractual relationship.  Mayor Smith has moved for summary judgment on this claim.  In Arkansas, winning a tortious interference with a contract lawsuit requires Crystal Clear to prove: (1) the existence of a valid and enforceable contract; (2) Mayor Smith's knowledge of the contract; (3) Mayor Smith's intentional interference with the contract; and (4) damages suffered by Crystal Clear as a result of Mayor Smith's interference.[117]  If Mayor Smith can establish that no rational juror could find for Crystal on all of these elements then summary judgment in favor of Mayor Smith is appropriate.

A.    *Individual or Official Capacity*

Before addressing any of the elements, there is a threshold question the Court must answer.  Was Mayor Smith acting in his individual or official capacity when he committed the acts that Crystal Clear claims tortiously interfered with the Agreement?  This question is critical because

---

[116] Defendants claim that they have already attempted to make such payment once and that Plaintiffs' counsel refused.  They also claim to have deposited the funds and have them ready to deliver.  *See supra* note 20.

[117] *Faulkner v. Ark. Children's Hosp.*, 347 Ark. 941, 959, 69 S.W.3d 393, 405 (2002).

the nature of a tortious interference claim requires at least three actors:  two actors who form a contract (one of which is the plaintiff) and a third actor (the defendant) who intentionally commits an improper act.  If Mayor Smith was acting in his official capacity, he would be an agent of the City and there would be no third person at all.  "A party to a contract and its employees and agents, acting within the scope of their authority, cannot be held liable for interfering with the party's own contract."[118]  The only proper claim in that scenario would be breach of contract.

Crystal Clear has listed numerous different actions by Mayor Smith as supporting its claim that Mayor Smith tortiously interfered with the Agreement.[119]  If Mayor Smith committed those acts within the scope of his official capacity as Mayor of Helena-West Helena, they cannot form the basis of a tortious interference claim because a third party is not present.[120]  Mayor Smith maintains that "at all times he acted in his capacity as Mayor."[121]  Crystal Clear's argument seems to be rooted in the premise that Mayor Smith acted in his individual capacity because he was not explicitly authorized to take every action listed.[122]  Crystal Clear points to several provisions of the Helena-West Helena City Code and a City Ordinance to define the scope of Mayor Smith's authority when it comes to making, performing, and terminating contracts.

As the Court reviews these provisions, it is important to note the Court's view that express authorization is not required to find that Mayor Smith acted in his official capacity for each and

---

[118] *Steinbuch v. Univ. of Ark.*, 2019 Ark. 356, at 16, 589 S.W.3d 350, 360.

[119] *See* Pls.' Br. in Opp'n to Defs.' Mot. for Summ. J. (Doc. 67) at 40-45.  Many of the acts listed by Crystal Clear are not undisputed facts.  For instance, Crystal Clear alleges that Mayor Smith purposely and maliciously withheld Crystal Clear's payments multiple times.  Mayor Smith disputes this, and the evidence provided by Crystal Clear is far from conclusive.  However, even assuming the generous pro-plaintiff summary judgment standard requires resolving all disputed facts in favor of Crystal Clear, no rational juror could rule for Crystal Clear on the causation prong.  This is discussed further below.

[120] *Steinbuch*, 2019 Ark. 356, at 16, 589 S.W.3d at 360.

[121] Defs.' Br. in Supp. of Summ. J. (Doc. 46) at 19.

[122] Pls.' Br. in Opp'n to Defs.' Mot. for Summ. J. (Doc. 67) at 28-37.

every action taken by him.  Instead, the proper inquiry is whether those actions fell "outside the scope of" his role as Mayor "in connection with" managing the City's finances.[123]  Of course, if Mayor Smith was expressly *prohibited* from taking an action, that would certainly cut against finding that he acted within the scope of his role as Mayor.

Helena-West Helena City Code Section 3.04.01 provides that the "Mayor or the City Council shall have exclusive power and responsibility to . . . make all necessary contracts for work or labor to be done . . . for the benefit of the city, or in carrying out any work or undertaking of a public nature therein."[124]  The Mayor's purchasing power is limited, however, by City Ordinance 10-2009, which states "that the Mayor may not enter into a contract that exceeds $5,000 without the City Council's approval."[125]  The Ordinance goes on to say that this limitation applies to "serial contracts," which are contracts that have been divided up into a series of smaller contracts, such that each is lower than $5,000, but "the entire scope of the work to be performed is in excess of $5,000."[126]

City Code Section 3.04.04(B) gives the Mayor the power to "approve for payment out of funds previously appropriated for that purpose, or disapprove any bills, debts, or liabilities asserted as claims against the city."[127]  Section 3.04.04(C) states that the Mayor's power under subsection (B) is "subject to" the limitation that any "contracts that have been previously approved by the

---

[123] *Steinbuch*, 2019 Ark. 356, at 16, 589 S.W.3d at 360 (citing *Faulkner*, 347 Ark. at 960, 69 S.W.3d at 405-06).

[124] Ex. 2 to Pls.' First Am. Compl. (Doc. 14-2) at 1 (providing City Code provisions); Defs.' Br. in Supp. of Summ. J. (Doc. 46) at 19-20 (citing Plaintiffs' complaint for City Code provisions).

[125] Ex. 6 to Pls.' First Am. Compl. (Doc. 14-6) at 1 (providing City Ordinance 10-2009).

[126] *Id.*  This ordinance was the basis of the City Council's admonishment of Mayor Smith during the May 21, 2019 City Council meeting.  The City Council and City Attorney Valley maintained that the month-to-month agreement with Mr. Dalencourt violated this ordinance. *See supra* notes 30-32 and accompanying text.

[127] Ex. 2 to Pls.' First Am. Compl. (Doc. 14-2) at 1 (providing City Code provisions); Defs.' Br. in Supp. of Summ. J. (Doc. 46) at 19-20 (citing Plaintiffs' complaint for City Code provisions).

Council shall continue in full force and effect."[128]  With these provisions in mind, the Court turns to Mayor Smith's actions.

The majority of the acts listed by Crystal Clear do not fall within the scope of the just-discussed City Code sections or City Ordinance 10-2009.  For example, Mayor Smith's January 2019 request that Crystal Clear re-bid its contract, his discussions with the Arkansas Municipal League about the legality of the Agreement, and his inquiries to other vendors about the prices they would charge for similar services all seem to fall directly within Mayor Smith's responsibilities to manage the City's finances.  No City Code provision or Ordinance provided by either party prevents Mayor Smith from asking these types of questions.

On the other hand, Mayor Smith acted outside the scope of his authority when he hired Mr. Dalencourt's company in May 2019 because any contract entered into by the Mayor in excess of $5,000 must be approved by the City Council.[129]  While the specific contract at issue here was only $3,410.00, it was described by Mayor Smith's Chief of Staff as a "month to month" contract and would therefore (at least for summary judgment purposes) fall into the "serial contract" provision of City Ordinance 10-2009.[130]

Moreover, the City Code limits the Mayor's spending power by requiring that any "contracts that have been previously approved by the Council shall continue in full force and effect."[131]  Mayor Smith hired Mr. Dalencourt's company with the intent of replacing Crystal Clear

---

[128] Ex. 2 to Pls.' First Am. Compl. (Doc. 14-2) at 1 (providing City Code provisions); Defs.' Br. in Supp. of Summ. J. (Doc. 46) at 19-20 (citing to Plaintiffs' complaint for City Code provisions).

[129] The City Council and City Attorney Valley certainly believed that Mayor Smith exceeded his authority.  *See* CD #1: May 21, 2019 Council Meeting Audio (on file with the Court) at 00:15:00, 00:24:15, 00:46:45.

[130] Defs.' Resp. to Pls.' Statement of Facts (Doc. 71) ¶ 29; Ex. 24 (Sophicity Notes and Mayor Smith's e-mails) to Pls.' Add. to Resp. to Defs.' Mot. for Summ. J. (Doc. 68-24) at 9.

[131] Ex. 2 to Pls.' First Am. Compl. (Doc. 14-2) at 1 (providing City Code provisions); Defs.' Br. in Supp. of Summ. J. (Doc. 46) at 19-20 (citing to Plaintiffs' complaint for City Code provisions).

as IT services provider for the City.  This is the only rational inference that can be drawn from the

e-mails to Mr. Simes demanding the return of all passwords and other data and requesting that Mr.

Simes work with Mr. Dalencourt on "IT transition."[132]  By exercising his spending power to

replace Crystal Clear as the City's IT services provider, Mayor Smith not only exceeded his $5,000

limit, but also tried to nullify a contract previously approved by the City Council.  Thus, Mayor

Smith acted beyond the scope of his authority when he tried to hire Mr. Dalencourt to replace

Crystal Clear.[133]

*B. Remaining Elements of Tortious Interference Claim*

Because Mayor Smith acted in his individual capacity when he tried to replace Crystal

Clear with Mr. Dalencourt's company, the necessary "third party" was present with respect to the

allegation that Mayor Smith tried to cause the termination of the Agreement.  The Court now turns

to the more traditional aspects of the analysis.

1. Existence of a Valid and Enforceable Contract

Determining whether the Agreement between Crystal Clear and the City was a valid and

enforceable contract requires answering difficult, novel, and unsettled questions of Arkansas

constitutional law.  Because summary judgment is appropriate on other grounds, the Court declines

to walk down this uncharted road.[134]  The Court assumes without deciding that the Agreement was

a valid and enforceable contract.

---

[132] Ex. 24 (Sophicity Notes and Mayor Smith's e-mails) to Pls.' Add. to Resp. to Defs.' Mot. for Summ. J. (Doc. 68-24) at 2-3; *Pedersen*, 775 F.3d at 1053 (giving the nonmoving party the benefit of all reasonable inferences).

[133] Mayor Smith argues that: (1) he had a good faith belief that the Agreement was void *ab initio*; and (2) this means his decision to hire another IT provider fell within his official role.  The Court disagrees.  Any reasonable reader of the City Code and Ordinance 10-2009 would understand the Mayor could not take this action without City Council approval.

[134] The Court believes this is how the Arkansas Supreme Court would address this issue.  *Landers v. Jameson*, 355 Ark. 163, 174, 132 S.W.3d 741, 748 (2003) (reaffirming longstanding practice of avoiding state constitutional questions when a case can be decided on other grounds).

2.  Mayor Smith's Knowledge of the Agreement

It is undisputed that Mayor Smith was aware of the Agreement between Crystal Clear and the City.

3.  Mayor Smith's Interference With the Agreement

There are two prongs to this element of a tortious interference claim.  The first prong is that Mayor Smith must have "either desired to bring about" the breach or termination of the Agreement or "have known that the result was substantially certain to be produced by his conduct."[135]  Mayor Smith does not address this first prong.[136]  He therefore concedes it, at least for summary judgment purposes.

As for the second prong, Mayor Smith's conduct must have been "improper."[137]  Arkansas courts consider several factors when determining if a defendant's conduct was improper.[138]  These factors include: (1) the nature of the defendant's conduct; (2) the defendant's motive; (3) the plaintiff's interests that were interfered with; (4) the interests advanced by the defendant; (5) the social interest in protecting the defendant's freedom and the plaintiff's contractual interests; (6) the proximity of the defendant's conduct to the interference; and (7) the relations between the parties.[139]

In this case, both parties' arguments are based on Mayor Smith's motive in hiring Mr. Dalencourt to replace Crystal Clear as the City's IT services provider.  Crystal Clear contends that Mayor Smith's actions were improper because he "sought to advance his personal interest in

---

[135] *Baptist Health v. Murphy*, 2010 Ark. 358, at 23, 373 Ark. S.W.3d 269, 285 (citing *Stewart Title Guar. Co. v. Am. Abstract & Title Co.*, 363 Ark. 530, 215 S.W.3d 596 (2005)).

[136] *See* Defs.' Br. in Supp. of Summ. J. (Doc. 46) at 19.

[137] *Mason v. Wal-Mart Stores, Inc.*, 333 Ark. 3, 7-8, 969 S.W.2d 160, 162 (1998).

[138] *See id.* at 14, 969 S.W.2d at 165 (adopting Restatement (Second) of Torts § 767's factors to guide courts' determination of improper conduct).

[139] *Baptist Health v. Murphy*, 365 Ark. 115, 125, 226 S.W.3d 800, 809 (2006).

benefitting his friend, not the City."[140]  Mayor Smith maintains that his motive "was the financial well-being of the City and its ability to meet its obligations."[141]

There is evidence in the record supporting both arguments. To Mayor Smith's point, it is true that Mr. Dalencourt's price was lower than Crystal Clear's and would therefore save the City money.  But it is also true, as Crystal Clear notes, that Mr. Dalencourt and Mayor Smith had a professional relationship that pre-dated Mayor Smith's decision to replace Crystal Clear with Mr. Dalencourt's company.[142]  Crystal Clear further undermines Mayor Smith's money-saving motive by pointing out that Sophicity submitted a bid for $1,364.32 per month, a significantly cheaper price than Mr. Dalencourt's $3,410.00 monthly fee.[143]  Mayor Smith's briefing offers no explanation as to why he chose a more expensive option for an "apples to apples" bid if his sole motivation for replacing Crystal Clear was to save the City money.  Drawing all inferences in favor of the nonmoving party, the Court finds that a rational juror could find that Mayor Smith's conduct was improper.[144]

4.  Mayor Smith's Improper Interference Did Not Cause Crystal Clear's Damages

As with any tort claim, Crystal Clear must be able to establish that Mayor Smith's improper actions caused its damages.[145]  Here, the damages Crystal Clear claims to have suffered are primarily due to the early termination of the Agreement.[146]  Crystal Clear argues that Mayor

---

[140] Pls.' Br. in Opp'n to Summ. J. (Doc. 67) at 40.

[141] Defs.' Br. in Supp. of Summ. J. (Doc. 46) at 19.

[142]  Ex. 32 (Mayor Smith's Responses to Interrogatories) to Pls.' Add. to Resp. to Defs.' Mot. for Summ. J. (Doc. 68-32) ¶ 12.

[143] Ex. 34 (Sophicity Price Quote) to Pls.' Add. to Resp. to Defs.' Mot. for Summ. J. (Doc. 68-34) at 7.

[144] *Pedersen*, 775 F.3d at 1053 (giving the nonmoving party the benefit of all reasonable inferences).  Likewise, there is sufficient evidence from which a juror could rationally conclude that the Mayor's purported belief that the agreement was void *ab initio* was simply a mask for the Mayor's real desire to hire a friend and benefactor.

[145] *Faulkner*, 347 Ark. at 959, 69 S.W.3d at 405.

[146] Pls.' Br. in Opp'n to Summ. J. (Doc. 67) at 45.  A portion of the damages claimed by Crystal Clear also come from not being paid for the months of April, May, June, and part of July 2019 while the Agreement was still in effect.  As

Smith's actions "induced the City's failure to perform its promise [to pay] and [Crystal Clear's] cancellation of its Agreement because of the City's *material* breach of the contract."[147]  However, as shown above in the analysis of the breach of contract claim, the City did not *materially* breach the contract when it failed to make its monthly payments on time.[148]  Instead, it was Crystal Clear and Mr. Simes who ended the Agreement without complying with the ninety-day notice requirement.

It very well may be the case that, after months of dealing with Mayor Smith's hostilities, Crystal Clear and Mr. Simes simply had enough and decided to walk away from the Agreement. But that does not render Mayor Smith liable for the damages caused by Mr. Simes's early termination of the Agreement.  Mayor Smith is only liable if his conduct "induce[d] or otherwise cause[d] *a third person* not to perform a contract."[149]  Here, that "third person" would be the City, and the City tried to continue with the Agreement up until the day that Mr. Simes sent the cancellation letter.  It cannot be said then that any of Mayor Smith's actions, improper and hostile as they may have been, caused the Agreement to end.  Thus, no rational juror could find based on this record that Mayor Smith caused the damages claimed by Crystal Clear.

---

noted above, the City is liable for those months under Crystal Clear's breach of contract claim.  The City has essentially conceded this point, as it has offered to pay Crystal Clear for those months and has the funds set aside to do so.

[147] Pls.' Br. in Opp'n to Summ. J. (Doc. 67) at 45 (emphasis added).

[148] *See supra* notes 74-96 and accompanying text.

[149] *Gunn v. Farmers Ins. Exchange*, 2010 Ark. 434, at 7, 372 S.W.3d 346, 352 (emphasis added).  Even in a situation where a defendant's interference caused *the plaintiff* to breach a contract, the causal chain must be much more concrete and direct to render the defendant liable.  For example, in *United Bilt Homes, Inc. v. Sampson*, the plaintiff had a contract with a third party for home repairs. 310 Ark. 47, 832 S.W.2d 502 (1992).  The defendant, essentially the plaintiff's insurer, made several demands of the repairman.  The plaintiff thought those demands were unnecessary and therefore the plaintiff did not require the repairman to satisfy them.  The defendant refused to pay for the repairs if its demands were not met, and the repairman successfully sued plaintiff for breach of contract when the plaintiff was unable to pay for the repairs.  The Arkansas Supreme Court held that the defendant's refusal to pay "plainly caused a breach of the contract between" the plaintiff and the repairman. *Id.* at 51, 832 S.W.2d at 504.  Here, Mayor Smith's actions did not "plainly" cause the Agreement's termination.  The City was ready to make its back payments and continue with the Agreement up until the day that Mr. Simes cancelled the Agreement.

There is one final quirk in this case that must be discussed.  Although (as just discussed) no rational juror could find that Mayor Smith caused the Agreement to end, a rational juror could find that Mayor Smith's improper interference caused the City to fall behind for the months of April, May, June, and half of July 2019.[150]  This is a breach of the Agreement (not a material breach, but a breach).  Assuming the Agreement was not void *ab initio* under the Arkansas Constitution, then a rational juror could find that Mayor Smith improperly interfered with a valid and enforceable contract.  This interference caused actual damages to Crystal Clear in the form of the unpaid months of April, May, June, and half of July 2019.  Nevertheless, summary judgment on even this more limited tortious interference claim is appropriate for two reasons.

First, the decision to not timely pay Crystal Clear for those months falls within Mayor Smith's role as Mayor and therefore the necessary "third party" was not present.  The exhibits and briefings in this case conclusively show that the City was in disastrous financial condition.[151]  Even if refusing to pay on time is technically a violation of the City Code, making decisions about who to pay and when to pay them was the nature of Mayor Smith's job (and Mayor Hollowell before him).  The failure to pay on time, even if caused by Mayor Smith, was therefore a breach (but not a material breach) by the City.  The City is liable for that breach, as discussed in the breach of contract claim analysis above.

Second, the Arkansas Supreme Court "has often expressed its disapproval of double recoveries."[152]  In cases such as this, where the plaintiff "proceeds against both the tortfeasor and the contractual partner, care must be taken to avoid an overlapping recovery."[153]  Because the

---

[150] Pls.' Br. in Opp'n to Defs.' Mot. for Summ. J. (Doc. 67) at 41, 45.

[151] *See, e.g.*, Ex. 6 (Legislative Audit) to Defs.' Mot. for Summ. J. (Doc. 45-2) at 6-42.

[152] *Douglas v. Adams Trucking Co.*, 345 Ark. 203, 211, 46 S.W.3d 512, 517 (2001).

[153] Howard W. Brill & Christian H. Brill, 1 *Arkansas Law of Damages* § 33:15 (Nov. 2020 Update).

Court has found that the only actual damages in this case are the unpaid months while the Agreement was still in effect, and has already found that the City is liable for those months, there are no actual damages left to award on the tortious interference claim.[154]

## CONCLUSION

Crystal Clear's Motion for Summary Judgment on the breach of contract claim is GRANTED in part.  Crystal Clear is owed payment for the months of April, May, June, and half of July 2019.  The City's Motion for Summary Judgment is GRANTED as to the remainder of Crystal Clear's breach of contract claim.  Mayor Smith's Motion for Summary Judgment on the tortious interference claim is GRANTED.

The parties are directed to file either a joint submission or simultaneous submissions within 21 days of the date of this Order setting forth the precise amount owed to Crystal Clear pursuant to the analysis contained in this Order.  Specifically, the parties are directed to address: (1) the dispute as to whether the bill for March 2019 has already been paid for by the City; (2) the appropriate interest rate, if any, under the applicable law; and (3) the amount owed for each month of April, May, June, and July 2019.

IT IS SO ORDERED this 15th Day of September 2021.

_____
LEE P. RUDOFSKY
UNITED STATES DISTRICT JUDGE

---

[154] As noted above, the City has conceded that it must pay for these months.  The City has already tried to deliver payment for these months to Crystal Clear once and has set the funds aside so that they are ready for Crystal Clear whenever it will accept the payment.  The only remaining aspect of the tortious interference claim would be the possibility of punitive damages against Mayor Smith.  But because there would be no actual damages awarded, there can be no punitive damages either.  *Bayer CropScience LP v. Schafer*, 2011 Ark. 518, at 13, 385 S.W.3d 822, 831 ("[P]unitive damages are dependent upon the recovery of compensatory damages, as an award of actual damages is a predicate for the recovery of punitive damages.").